IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

YOST V. YOST

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JEFFERY R. YOST, APPELLANT AND CROSS-APPELLEE,

V.

SHELLEY A. YOST, NOW KNOWN AS SHELLEY A. BAXTER, APPELLEE AND CROSS-APPELLANT.

Filed June 7, 2022.    No. A-21-479.

Appeal from the District Court for Otoe County: JULIE D. SMITH, Judge. Affirmed as modified.

Donald A. Roberts and Justin A. Roberts, of Roberts Law, L.L.C., for appellant.

Gregory D. Barton, of Barton Law, P.C., L.L.O., for appellee.

PIRTLE, Chief Judge, and BISHOP and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Jeffery R. Yost appeals from portions of the Otoe County District Court's order governing his motion to find Shelley A. Yost, now known as Shelley A. Baxter, in contempt for failing to follow the court's amended dissolution decree and Shelley's objection to his management of a business account following the court's entry of the decree. Shelley cross-appeals from portions of the court's order governing her objections to Jeffery's management of the business account. For the reasons set forth herein, we affirm as modified.

## II. STATEMENT OF FACTS

On June 10, 2019, the Otoe County District Court entered a decree dissolving Jeffery and Shelley's 29-year marriage. The court divided the parties' marital property and awarded Shelley $1,400 in monthly alimony. As relevant to this appeal, the court awarded the marital home to

- 1 -

Jeffery along with an office, shop, and certain farmland located on that property; awarded shares in the family owned business known as B-Y Excavating, Inc., to Jeffery subject to his obligation to liquidate certain business assets, deposit the proceeds in a designated checking account located at First Nebraska Bank (the Business Account), pay certain authorized expenditures, and then equally divide the net proceeds with Shelley; instructed Shelley to sell a certain motorcycle and baseball cards and divide the proceeds with Jeffery; and required Jeffery to pay Shelley an equalization payment in the amount of $234,176.75.

Shelley timely filed a motion for new trial and motion to alter or amend the decree. Following a hearing on the motion, the court ordered a new trial on the sole issue of how certain tax liabilities owed by Shelley should be treated in the marital property division and amended the decree by (1) prohibiting Jeffery from continuing to pay his $175,000 salary from the Business Account and (2) finding that Jeffery's payment of attorney fees from the Business Account was unauthorized and included the unauthorized $56,152.98 payment as a "marital asset awarded to [Jeffery] on his side of the balance sheet." Following the new trial on the issue of how to treat Shelley's tax liability, the court entered a final amended decree on October 4, 2019, which adopted the prior decree, in part, but added a provision requiring Jeffery to pay Shelley $46,650 which represented Shelley's portion of prior business income taxes. After factoring in the $56,152.98 marital asset assigned to Jeffery relating to his unauthorized payment of attorney fees, the court recalculated Jeffery's court-ordered equalization payment, revised the payment obligation to $262,253.24, added the $46,650 tax obligation, and ordered Jeffery to pay Shelley a final equalization payment of $308,793.24. At the time the amended decree was entered, Jeffery remained subject to his future obligation to liquidate the business assets, deposit the proceeds in the Business Account, and split the proceeds with Shelley. Shelley remained obligated to sell a motorcycle and baseball cards and split the proceeds with Jeffery. Neither party appealed from the amended decree despite language in the decree stating that it was a final order.

On October 23, 2019, Jeffery filed a complaint to modify the alimony award. In December, Jeffery filed a motion to show cause why Shelley should not be held in contempt for leaving the home in a damaged condition, for improperly removing a shed from the property, and for failing to sell a motorcycle and baseball cards in the manner specified in the decree and divide the proceeds with him. On May 14, 2020, Shelley filed a motion to compel Jeffery to submit a final accounting from the Business Account following Jeffery's court-ordered sale of assets. The court ordered Jeffery to file a final accounting by July 10. Following Jeffery's filed accounting, on July 20, Shelley filed a formal objection to the accounting claiming Jeffery had dissipated marital assets in connection with his court-ordered management of the Business Account.

Over 3 days in September, November, and December 2020, the court held a trial on Jeffery's complaint to modify, Jeffery's motion for an order to show cause, and Shelley's motion objecting to Jeffery's final accounting of the Business Account. On January 30, 2021, the court entered an order finding that the alimony award should be eliminated; that Jeffery had improperly dissipated certain funds from the Business Account; that Jeffery was entitled to a credit for certain boat motors which should not have been treated as liquidated business assets; that Shelley was in contempt for writing profanity on the staircase of the home but was not otherwise in contempt for other property damage; that Shelley was obligated to reimburse Jeffery $9,000 representing the

value of the shed she was not authorized to remove; and that Shelley was not in contempt for failing to sell the motorcycle and baseball cards as instructed but awarded the cards to Jeffery.

Following the entry of the court's order, Shelley timely filed a motion for a new trial and to alter or amend the judgment arguing, among other things, that the court erred in failing to include additional dissipated funds in its calculation of the Business Account. On May 16, 2021, the district court amended its January 30 order, in part, finding that there were additional funds dissipated by Jeffery in connection with his use of the Business Account and recalculated Jeffery's payment obligation to Shelley. Jeffery has appealed, and Shelley has cross-appealed, from the court's May 16, 2021, order.

## III. ASSIGNMENTS OF ERROR

Jeffery's assigned errors, renumbered and restated, fall into two categories. The first category relates to the court's findings governing Jeffery's motion to find Shelley in contempt for violating the amended decree. As to that portion of the order, Jeffery assigns that the court abused its discretion in failing to hold Shelley in contempt of court for (a) causing smoke and paint damage to the property awarded to Jeffery; (b) removing property from the marital home awarded to him including (i) a fabricated shed, (ii) blinds and mirrors, and (iii) a shop heater; (c) failing to properly administer the sale of a Honda motorcycle; (d) failing to sell the baseball cards as ordered by the court; and (e) that the court erred in its findings as to the value of the shed and in ordering Shelley to pay that value rather than ordering her to return it.

The second category of assigned errors relates to the court's findings governing Shelley's objection to Jeffery's final accounting of the Business Account in which Jeffery contends that the court erred in (a) finding Shelley's objections to Jeffery's final accounting of the Business Account were timely; (b) finding Jeffery improperly dissipated assets from the Business Account by (i) paying his personal health insurance premium, (ii) purchasing a $12,000 pickup he was required to sell in the decree, and (iii) paying unauthorized attorney fees to Dvorak Law for its representation of B-Y in a separate civil suit against Shelley; and (c) in failing to give Jeffery credit against his payment obligation for the sale of a boat that was separately awarded to him but sold as part of the business auction and the proceeds deposited in the Business Account.

In her cross-appeal, Shelley's assigned errors all relate to her objections governing the final accounting of the Business Account. She asserts that the district court erred in (a) allowing Jeffery to retain, without any offset, the benefit of $132,153.22 in "Payroll Expenses" consisting of Jeffery's salary in excess of $115,000 paid to Jeffery from the Business Account between November 2018 and August 2019 and the payment of Jeffery's payroll taxes; (b) failing to order Jeffery to pay Shelley an amount paid from the Business Account to the Lutz accounting firm; (c) failing to order Jeffery to pay Shelley certain other miscellaneous funds paid from the Business Account which were used to pay Jeffery's recurring personal monthly bills; (d)refusing to place a value on the Business Account in order to assess her entitlement to the residue; and (e) failing to order Jeffery to pay Shelley 50 percent of the residue in the Business Account.

## IV. STANDARD OF REVIEW

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which the trial court's

(1) resolution of issues of law is reviewed de novo, (2) factual findings are reviewed for clear error, and (3) determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Becher v. Becher*, 311 Neb. 1, 970 N.W.2d 472 (2022).

## V. ANALYSIS

### 1. EFFECT OF JEFFERY'S PAYMENT

Before addressing the merits of Jeffery's appeal and Shelley's cross-appeal, we first address Shelley's argument that the issues argued by Jeff were rendered moot by his voluntary payment of the January 2021 judgment against him. Shelley contends that because many of Jeff's assignments of error are based on the court's resolution of issues from the January 2021 order and because Jeffery made payment in response to that order, his assigned errors relating to that payment obligation should be rendered moot and we need not consider them further.

Generally, an appellant may not voluntarily accept the benefits of part of a judgment in the appellant's favor and afterward prosecute an appeal or error proceeding from the part that is against the appellant. *Liming v. Liming*, 272 Neb. 534, 723 N.W.2d 89 (2006). But the acceptance of benefits rule has exceptions. *Id.* For instance, a spouse who accepts the benefits of a divorce judgment does not waive the right to appellate review under circumstances where the spouse's right to the benefits accepted is conceded by the other spouse, the spouse was entitled as a matter of right to the benefits accepted such that the outcome of the appeal could have no effect on the right to those benefits, or the benefits accepted are pursuant to a severable award which will not be subject to appellate review. *Id.*

The record here reveals that following the entry of the January 2021 order, Shelley filed a motion to alter or amend which tolled the time for the filing of an appeal from that order. Thereafter, following the entry of the order on the motion to alter or amend, Jeffery appealed. However, prior to his appeal, Jeffery made various payments on his multiple court-ordered obligations. According to Shelley, these actions should be considered a voluntary acceptance of the ultimate judgment and prohibit prosecution of his appeal. Whether some of Jeffery's payments could be considered a voluntary acceptance of the benefit of a prior judgment is a matter we need not decide because, as we explain in the next section of the opinion, we reject each of Jeffery's assignments of error, and resolution of this argument is not necessary to our disposition of this appeal.

### 2. JEFFERY'S APPEAL

Jeffery's appeal contains two categories of assignments of error. The first relates to issues regarding the district court's failure to hold Shelley in contempt. The second relates to Jeffery's accounting of the sale of certain business assets and subsequent deposit of the proceeds into the Business Account.

#### (a) Contempt

Jeffery argues that the court abused its discretion (i) in failing to hold Shelley in contempt for property damage to the marital home; (ii) for removing property from the marital home which had been awarded to him in the dissolution decree; (iii) for failing to sell the Honda motorcycle in a commercially reasonable manner; (iv) for failing to make reasonable efforts to sell the baseball

cards as ordered in the original and amended decrees, and (v) in ordering Shelley to pay Jeffery $9,000 for the shed and not ordering that she return it.

Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party fails to comply with a court order made for the benefit of the opposing party. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018). A court's continuing jurisdiction over a dissolution decree includes the power to provide equitable relief in a contempt proceeding. *Id.* Contempt proceedings may both compel obedience to orders and administer the remedies to which the court has found the parties to be entitled. *Id.* Where a situation exists that is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation. *Id.*

Civil contempt requires willful disobedience as an essential element. *Id*. "Willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Id*. If it is impossible to comply with the order of the court, the failure to comply is not willful. *Id*. Willfulness is a factual determination to be reviewed for clear error. *Id*. Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence and without any presumptions. *Id*.

### (i) Property Damage to Marital Home

Jeffery first argues that the district court erred in failing to hold Shelley in contempt for smoke and paint damage she caused to the marital home in violation of the original and amended decrees which required her to leave the premises in good condition and not cause property damage.

This claim stems from the district court's October 14, 2019, amended decree which specified, in relevant part:

> [Shelley] has been on notice since June 10, 2019, that [Jeffery] was awarded the marital home. . . . [Shelley] should vacate the premises no later than October 20, 2019. [Shelley] should give notice through her attorney to [Jeffery's] attorney on the date that she vacates the premises. [Shelley] should leave the premises in good condition and not cause any property damage. . . . Any items which are fixtures (i.e. items permanently attached to the structure or which cannot be removed by simply unplugging the item) must remain with the property, including but not limited to all remodeling performed by Magee Remodel, Inc. [Shelley] should not remove anything from this real property not specifically awarded to her in this Decree.

At the contempt hearing, Jeffery testified that there was smoke damage in the master bedroom and the walls were poorly painted two different colors. In furtherance of his claim, Jeffery provided photographic evidence depicting the smoke damage and called an expert to testify as to its possible cause as well as the cost to repair the damage. The expert stated that the smoke damage appeared to be caused by candles or a fire outside of the master bedroom which occurred when the master bedroom door was open. Jeffery testified that the fire damage was likely caused by Shelley's use of a firepit during a November 2018 party. Shelley did not dispute having a party in November 2018 and using the firepit during that time. The district court found that, because the smoke damage likely occurred prior to June 2019, the date Shelley was first placed on notice

Jeffery would be awarded the home, and prior to the October 4, 2019, final decree, Jeffery failed to prove that Shelley willfully or maliciously violated the decree. We agree.

Based on the record, including both parties' statements regarding the likelihood that the smoke damage occurred in November 2018, we find no clear error in the court's factual determination that the smoke damage occurred prior to the entry of the original June 2019 dissolution decree, the date Shelley learned Jeffery would be awarded the home. Because there was no evidence presented that the smoke damage occurred after the dates of either the June 2019 original decree or the October 2019 amended decree, we find the court did not err in failing to hold Shelley in contempt for willfully causing smoke related damage to the property in defiance of the court's order.

Next, we consider Jeffery's claim that the court erred in failing to hold Shelley in contempt for intentionally painting two of the walls different colors in violation of the court's order. Shelley testified that in 2017, prior to the entry of the initial decree, she intentionally painted the walls but did not have a chance to finish painting. Again, because the district court found that Shelley's conduct predated both the original decree and amended decree, the court found Jeffery failed to satisfy his burden to show that Shelley willfully or maliciously disobeyed the court's order. We agree with the district court. Because we find no clear error in the court's factual findings, we find that the district court did not abuse its discretion for failing to hold Shelley in contempt in connection with Jeffery's claims that Shelley intentionally and maliciously left the property in a state of disrepair in violation of the court's decree. This assignment of error fails.

### (ii) Removal of Property From Marital Home

Second, Jeffery contends that the district court erred in failing to hold Shelley in contempt for her removal of a fabricated shed, blinds and mirrors, and a shop heater from the marital home. Jeffery asserts that Shelley's removal of these items directly violated the court's amended decree which provided:

> Any items which are fixtures (i.e. items permanently attached to the structure or which cannot be removed by simply unplugging the item) must remain with the property, including but not limited to all remodeling . . . [Shelley] should not remove anything from this real property not specifically awarded to her in this decree.

### a. Removal of Fabricated Shed

Jeffery contends that the district court erred in failing to hold Shelley in contempt for removing the fabricated storage shed from the marital property.

In the court's temporary order, Shelley was awarded temporary exclusive possession of the marital home; however, the temporary order did not mention the shed located on the property. Thereafter, the court's original and amended dissolution decrees ultimately awarded the marital home to Jeffery but again did not specifically mention the shed. The court awarded Shelley "household and lawn furniture" some of which was contained inside the shed. The original decree provided Shelley with 45 days to vacate and ordered her to leave the premises in "good condition and not cause any property damage." After Shelley vacated the marital home, Jeffery filed a motion to determine damages and a motion for contempt based on Shelley's removal of the shed.

- 6 -

Shelley testified at the contempt hearing that she believed that she was awarded the shed as part of the award of "household and lawn furniture." She further testified that she clarified with her attorney that the shed was included in her award since the lawn furniture and other items awarded to her were contained within the shed. In contrast, Jeffery argued that the decree explicitly set forth that Shelley was not to remove anything from the marital home or property that had not been specifically awarded to her and that, since the shed was not specifically awarded to her, her removal of the shed amounted to a willful and malicious violation of the original and amended decrees.

In the January 2021 order, the district court determined that Jeffery failed to meet his burden to show that Shelley's removal of the shed was in willful or malicious disobedience of the court's order. The court found that although Shelley's belief that she was awarded the shed was misguided, the court found that the evidence did not support an order of contempt. Notwithstanding its findings, the court ordered Shelley to reimburse Jeffery for the full value of the shed which value the court determined to be $9,000 and awarded the shed to Shelley.

Giving weight to the fact that the trial court heard and observed the witnesses and the evidence, we find that the court did not clearly err by accepting Shelley's testimony as true. Having determined that the court did not err in finding that Shelley was only mistaken in her belief and did not willfully disobey the court's order, we find the court did not abuse its discretion in concluding Shelley was not in contempt of the court's prior decree. This assignment fails.

### b. Removal of Blinds and Mirrors

Jeffery next asserts that the court erred in failing to hold Shelley in contempt for removing window blinds and bathroom vanity mirrors from the marital home. We note that the district court did not determine whether the blinds or mirrors were fixtures; instead, the court found that Jeffery failed to satisfy his burden to establish that the removal of those items was willful or malicious.

Although Shelley admitted to removing blinds from the home, she testified that she had purchased the blinds after the parties' separation and provided receipts of the purchase. Shelley also testified that the bathroom mirrors were purchased after the parties' separation and were just hung on the wall by a nail and therefore were not fixtures. The district court found that, since Shelley acquired the blinds and the bathroom mirrors after the parties' separation and provided evidence of her purchase of the blinds, that evidence did not support a finding that Shelley's decision to remove them constituted a willful violation of the court's order instructing her not to remove property fixtures.

Whether the blinds and mirrors constitute fixtures we need not decide. We find no clear error in the court accepting Shelley's version of the facts; that is, that Shelley purchased the items she eventually removed after the parties' separation subject to her understanding that the property was hers and she had the right to remove them. In light of that finding, we cannot say that the court abused its discretion in finding Shelley was not willfully disobeying the court's order based on her understanding of her rights to the specific property, not specifically mentioned in the decree, which she purchased herself after the parties' separation. This assignment fails.

### c. Removal of Shop Heater

Jeffery next contends that the district court erred in failing to hold Shelley in contempt for her removal of a shop heater from the marital property. Jeffery asserts that the district court should have found Shelley in contempt because, combined with her "obvious dislike" of Jeffery, she provided no evidence that the heater was not working, did not return the heater, and could not recall where she put the heater.

At trial, Shelley testified that she removed the heater, which was not working, to determine if it could be repaired. After being advised that the heater could not be repaired, she did not return the heater to the shop and believed she stored it. The court found that Jeffery failed to meet his burden of proof to establish that Shelley was in willful contempt. Again, where the evidence is in conflict, we give weight to the fact that the district court observed and heard the witnesses. *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021). Therefore, we find no error in the court's factual determination that Shelley's removal of the broken heater did not amount to willful disobedience of the court's order and no abuse of discretion in failing to hold her in contempt for its removal.

### (iii) Sale of Honda Motorcycle

Jeffery next contends that the district court erred in refusing to hold Shelley in contempt for failing to sell the Honda motorcycle in a commercially reasonable manner as required under the decree which required Shelley to "sell on eBay or some similar site, the 1986 Honda GL 1200 [motorcycle] and the baseball cards owned by the parties. [Shelley] shall account to [Jeffery] by supplying documents showing the sale of these items and the parties shall each receive 50% of the net sale proceeds."

A commercially reasonable sale is an attempt to sell the property in the manner which will bring the best price for the property. *In re Estate of Failla*, 278 Neb. 770, 773 N.W.2d 793 (2009).

Jeffery contends that, despite the motorcycle being valued at $5,000 on their property statement, Shelley sold it for $900. Jeffery asserts that Shelley demonstrated no legitimate reason for selling the motorcycle below its value; that the transaction was a sham; and that the conduct is right out of the movie "First Wives Club." Brief of appellant at 20. At trial, Shelley testified that she had originally listed the motorcycle for sale for $2,500 on Facebook Marketplace, but later decreased the price after negotiating with the buyer. Shelley offered into evidence the messages that took place between her and the buyer. In the communication between Shelley and the buyer on Facebook, she advised the buyer that the motorcycle had not been started for over a year, but that it worked prior to that. Shelley sold the motorcycle for $900 and split the proceeds with Jeffery.

Here, although the price obtained for the motorcycle was below the parties' original valuation, the motorcycle was 34 years old, and Shelley accepted what she described as the only offer for the motorcycle. The district court found that, due to the motorcycle's age and condition, and based upon Shelley's testimony, it was sold in a commercially reasonable manner and that Jeffery did not satisfy his burden of proof to show that Shelley willfully and maliciously violated the court's order. When evidence is in conflict, we give weight to the fact that the district court heard and observed the witnesses. *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021). We find that the court did not clearly err in accepting Shelley's version of the facts over Jeffery's, and when applying those facts, we find no clear error in the court's finding that Shelley's actions were

not in willful disobedience of the court's order. Therefore, we find that the district court did not abuse its discretion in failing to hold Shelley in contempt for selling the motorcycle below the parties' originally estimated value.

### (iv) Failure to Sell Baseball Cards

Jeffery next argues that the district court erred in failing to find Shelley in contempt for neglecting to sell baseball cards as required under the original and amended decrees. He contends that Shelley made no reasonable efforts for over a year to sell the cards and that her failure to do so amounted to a willful disobedience of the court order.

Shelley testified that the baseball cards she was ordered to sell belonged to her father and there were hundreds of cards contained in a binder and thousands of cards contained in a box. Shelley testified that she contacted a baseball card collector who stated that he already had most of the cards she was selling and that there was a flood in the market for her specific cards. Shelley stated that she also priced out some of the baseball cards on eBay and found that each card was worth between 59 and 95 cents. At the hearing on the motion for contempt, Shelley indicated that she was willing to give Jeffery the baseball cards. The court then awarded the cards to Jeffery. As a result, the district court found that Shelley was not in contempt since the evidence established that Shelley had attempted to sell the cards but was unable to do so.

We find no error in the court's factual determination that Shelley took steps to comply with the court order but was unsuccessful. Further, the court awarded the baseball cards to Jeffery. The court is permitted to enforce its order with a remedy that is equitable under the circumstances. See *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018). We find no abuse of discretion in the court's findings here. This assignment of error fails.

### (v) Value and Return of Shed

Jeffery next assigns that the district court erred in failing to order Shelley to return the fabricated shed she removed from the marital property and in valuing the shed at $9,000. Jeffery contends that, because Shelley did not hire an expert to testify to the value of the shed to refute his valuation, the court abused its discretion in valuing the shed at $9,000 dollars. He also asserts that the court abused its discretion in failing to order Shelley to return the shed.

As stated above, the district court determined that Shelley was not in contempt for her removal of the shed finding that her belief that she was awarded it was simply misguided. However, because she mistakenly removed the shed, the court ordered Shelley to pay Jeffery $9,000 for the shed's value. At the trial, although Jeffery testified that the shed was valued between $11,000 and $15,000, Shelley testified that she did not believe the shed was worth over $10,000. As the Nebraska Supreme Court noted in *Jeffres v. Countryside Homes*, 220 Neb. 26, 367 N.W.2d 728 (1985), "the law is well settled that the owner of personalty is qualified to express an opinion of its value solely because of her status as owner." Although the rule differs to some degree regarding the value of real estate, values for this property were obtained from both parties and Jeffery did not assign error to any such rulings governing their admissibility.

Here, the parties' testimony conflicted as to the type and value of the shed. Jeffery contended the shed was custom whereas Shelley stated that the shed was purchased for $500 and was not customized. The district court adopted a valuation which struck a balance between the

values urged by both parties. Jeffery's counsel appeared to accept the appropriateness of this award as during the hearing on Shelley's motion for a new trial or to alter or amend the judgment, Jeffery's counsel acknowledged that the court "put the number for the [shed] in the middle [of the parties' valuations.] I don't see any problem with that." Where, as here, the evidence is in conflict, we give weight to the fact that the district court heard and observed the witnesses and find no error in the court's adoption of a value which struck a balance between the values properly admitted into evidence.

Second, as to Jeffery's argument that the court should have ordered Shelley to return the shed, Jeffery fails to cite to any case law which would entitle him to its return as opposed to, or in addition to, an award of the shed's full value. As we stated earlier, in a contempt proceeding, a court's continuing jurisdiction over a dissolution decree includes the power to provide equitable relief. Also, where a situation exists that is contrary to the principles of equity and which can be addressed within the scope of the judicial action, the court is permitted to devise a remedy to meet the situation. See *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018). The record establishes that the court devised an equitable remedy by ordering Shelley to pay for the full value of the shed which the court determined was $9,000. Awarding Jeffery both the shed and the $9,000 value of the shed would be providing Jeffery a windfall. We find the court did not abuse its discretion in ordering Shelley to pay the value of the shed she removed from the marital property, as opposed to returning the shed. Therefore, this assignment of error fails.

(b) Accounting

Jeffery's second category of assigned errors relates to his accounting of the sale of certain business assets and subsequent deposit of the proceeds into the Business Account. The issues relate to that portion of the October 2019 amended decree wherein the court stated as follows:

IT IS FURTHER ORDERED, by the Court that [Jeffery] is awarded all right, title and interest in and to [B-Y] free and clear of any interest of [Shelley]. Provided, however, that the following items shall be sold in a commercially reasonable manner through the entity known as "Auction Time," with such sale to be completed within six (6) months after the Decree is entered:
Sea Ark 21′ boat and trailer
Munson 18′ boat and trailer
Sea Ark 28′ boat and trailer
Rough neck flat bottom boat
Monarch 21′ boat and trailer
Kann 20′ boat Ranger boat & trailer
Grove 85 T Crane
Caterpillar paving machine
(4) 40′ storage units
30′ freight container
10 storage containers
20′ semi container trailer
2 Hotsy steam cleaners
Tools, tool boxes, welders, lathes

- 10 -

Vermeer tree spade

2009 GMC Acadia

2014 Ford F-250

2009 Gimma Tractor

All proceeds from the sale of the equipment shall be deposited into Account No. XXX9956 at First Nebraska Bank. [Jeffery] shall provide to [Shelley] a monthly accounting of the sale of these assets, and a monthly accounting of the monies held in Account No. XXX9956, including a list of all operating expenses incurred to prepare the equipment for sale, to pay accounting and actual expenses, together with expenses incurred by Auction Time. Once the sale of all of the equipment listed above is complete, [Jeffery] shall provide a final accounting of the sale and Account No. XXX9956 to [Shelley]. [Shelley] shall have thirty (30) days thereafter to make any specific objections to the accounting. Absent any objections, all remaining proceeds in that account, shall forthwith be divided equally between the parties.

Shelley eventually filed an objection to the accounting provided by Jeffery. Jeffery assigns numerous errors in connection with the court's findings governing Shelley's objections to his accounting of the Business Account. Jeffery asserts that the district court erred in finding that Shelley's objection to the final accounting of the Business Account was timely; in finding that he improperly dissipated assets when he used the business account to pay his health insurance premium, purchase a pickup truck, and pay certain attorney fees; and in failing to give him credit against the amount payable to Shelley for proceeds he placed in the Business Account after selling a boat he was separately awarded.

Before addressing Jeffery's assigned errors in connection with Shelley's contest to Jeffery's accounting, we must first identify the nature of the proceeding itself. We believe that the nature of the proceeding was identified by the Nebraska Supreme Court in *Johnson v. Johnson*, 308 Neb. 623, 956 N.W.2d 261 (2021), wherein the court held:

The district court's authority to enforce the decree was not limited by the fact that [the mother] initiated contempt proceedings. Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party fails to comply with a court order made for the benefit of the opposing party. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018). A court's continuing jurisdiction over a dissolution decree includes the power to provide equitable relief in a contempt proceeding. *Id*. Contempt proceedings may both compel obedience to orders and administer the remedies to which the court has found the parties to be entitled. Where a situation exists that is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation. *Id*. Although the district court apparently concluded that [the father] did not willfully violate the decree by not paying [the daughter's] automobile and college expenses, and therefore did not hold him in contempt for failing to do so, it still had authority to enforce the decree by compelling him to follow it.

Here, although Shelley did not identify her challenge to Jeffery's accounting as a contempt action, we find the proceeding as one instituted to preserve and enforce Shelley's rights when she believed Jeffery failed to comply with a court order made for her benefit. As such, we find the proceeding to be a contempt proceeding seeking to enforce the court's order in the decree and we apply the standard of review for contempt proceedings set forth earlier in this opinion. We now proceed to address Jeffery's assigned errors independently.

*(i) Timeliness of Objection to Final Accounting*

Jeffery first argues that the court erred in finding that Shelley timely filed her objection to his final accounting of the Business Account following his presentation of that final accounting. As to that finding, the record establishes that, during discovery in December 2019, Jeffery provided certain documents relating to the Business Account and the sale of the equipment. The parties then disputed whether all the documents were provided. In March 2020, Shelley's counsel sent an email inquiring about when Shelley would expect to receive a final accounting. In April, Jeffery provided supplemental discovery responses to Shelley's prior request for production of documents. In his response, Jeffery indicated that his December 2019 responses and March 2020 supplemental responses constituted his final accounting. In response, Shelley filed a motion to compel Jeffery to file a compliant final accounting which motion was granted by the district court. The court found that Jeffery had not provided the final accounting through his initial and supplemental discovery and that the 30-day period for Shelley to file her objection had not been triggered and granted Jeffery until July 10 to file a final accounting. Following the court's order, Jeffery timely filed and served the final accounting, and 10 days later, Shelley filed her objection alleging improper expenditures from the Business Account which she alleged resulted in a dissipation of the Business Account that the parties were required to divide equally. Following a hearing thereon, the district court found that Shelley's objection was timely. Jeffery assigns error to that finding. We disagree.

After reviewing the record associated with Jeffery's disclosures, the court's rulings thereon, and the court's ultimate conclusion that Shelley's final objection was timely filed, we cannot say that the court clearly erred in finding that Shelley timely filed her objection or that the court abused its discretion in determining that Shelley complied with the court's order. Jeffery's assignment that the court erred in its determination of the timeliness of Shelley's objection fails.

*(ii) Dissipation of Marital Assets*

Jeffery next argues that the district court erred in finding that he failed to comply with the court's order governing certain payments he made from the Business Account. More specifically, Jeffery argues that the district court erred in finding that he improperly disbursed payments from the Business Account relating to the payment for his personal health insurance premiums, the purchase of the 2014 Ford pickup, and for his payment of certain attorney fees to Dvorak Law. We will discuss those findings independently.

a. Health Insurance Premiums

Jeffery first argues that the district court erred in finding that he improperly disbursed funds from the Business Account for his personal health insurance premiums. He argues that, because the terms of the temporary order ordered him to maintain health insurance through October 4,

2019, payments made from the Business Account utilized for that purpose complied with the court's order. The court found that Jeffery's utilization of the Business Account for this purpose violated the decree because "[Jeffery's] personal health insurance premium obviously does not constitute an 'operating expense incurred to prepare the equipment for sale.' [Jeffery] shall reimburse [Shelley] for half of the $11,144.40 (or $5,572.20) which he dissipated from the Business account to pay his health insurance."

Shelley testified that, as of July 31, 2017, Jeffery was no longer providing insurance coverage for her as she had obtained her own insurance through her employer. She argues that Jeffery's $11,144.40 payment for his personal health insurance premiums in November 2018 from the Business Account constituted an improper use of the funds because it was unrelated to expenses authorized by the decree. Jeffery contends that, because he was otherwise awarded B-Y's business in the decree, he was permitted to use the account for personal expenses. We disagree.

Although we agree that the court's May 2016 stipulated order required Jeffery to "assume the monthly premium for [the parties'] joint health coverage during the pendency of this action and until further order of the court," the order did not provide that Jeffery could pay the health insurance premiums from the Business Account. Further, although the court's June order awarded Jeffery "the exclusive possession" of B-Y, he was otherwise specifically instructed that as to the Business Account, Jeffery was to sell certain business assets; deposit the funds in the Business Account; utilize the account proceeds for operating expenses associated with preparing the equipment for sale, accounting, and actual expenses including those of Auction Time; provide a full accounting of those transactions; and divide the remaining proceeds in that account with Shelley.

We agree with the district court that under the decree, the Business account was to be used by Jeffery as a repository for the business assets sold with expenses paid only relating to the sale and accounting relating to that function with the remaining proceeds to be split between Jeffery and Shelley. Because Jeffery was not authorized to pay personal health insurance premiums from the Business Account under the specific terms of the decree, we find that the court did not err in finding that this was an unauthorized disbursement from the Business Account. This assignment fails.

### b. 2014 Ford Pickup

Jeffery next argues that the district court erred in finding that he made an unauthorized payment from the Business Account by purchasing his 2014 Ford pickup. He claims that the court erred in finding that he purchased the vehicle with proceeds from the Business Account rather than his own personal funds.

The 2014 Ford pickup was one of B-Y's assets that the court ordered should be sold with the proceeds to be split between the parties. The record shows that on November 20, 2019, Jeffery paid a sum of $12,000 from the Business Account to a company that was auctioning off some of B-Y's business equipment. Jeffery argues that he reimbursed the Business Account with his own personal funds. The court, in its May 2021 order on the motion to alter or amend stated that "it was improper for [Jeffery] to use $12,000 from [the B-Y account] to buy the pickup truck for himself. He shall pay [Shelley] $6,000."

- 13 -

From our review of the record, check number 1890 was written from the B-Y account to Jeffery for $12,000. The auction company's representative testified that Jeffery sent a check for $12,000 for the pickup. Jeffery's accounting expert testified that the last sale or deposit of the equipment for the Business Account occurred in November 2019 which corresponded with the date of the payment for the pickup.

Pursuant to the decree, Jeffery was to use the Business Account as a repository for the sale of designated assets of B-Y with the net proceeds of the sale to be split between the parties. Jeffery testified that he did use the Business Account to pay certain personal expenses. However, Jeffery's accounting expert stated that certain of those payments were then booked as an account receivable of the company to be paid by Jeffery. Although he testified that some of the receivables were reimbursed by Jeffery, he acknowledged that the receivable balance was not fully reimbursed. William Strain, Shelley's accounting expert, testified that had B-Y booked an account receivable balance to correspond with Jeffery's personal expenditures paid through the Business Account, it would have been depicted as an asset on B-Y's balance sheet. He testified that there was not an accounts receivable from Jeffery shown on B-Y's balance sheet which meant that Jeffery's personal expenses were either paid back or forgiven and based on the records, he believed that the expenses were forgiven and never paid back into the Business Account.

After reviewing this testimony, the district court concluded that Jeffery had not reimbursed the Business Account for his $12,000 payment to acquire the 2014 Ford pickup truck. Following our de novo review of the record, after giving weight to the determination of the district court judge who heard and observed the witnesses and accepted one version of the facts over another, we find that the court did not clearly err in its determination that Jeffery improperly utilized the Business Account to purchase the vehicle and did not reimburse the Business Account. Jeffery's assignment of error fails.

### c. Attorney Fees

Jeffery next argues that the district court erred in finding that he improperly used the Business Account to pay attorney fees to the Dvorak law firm.

Following the entry of the initial dissolution decree, Shelley filed a motion for a new trial or to alter or amend the judgment asserting that Jeffery had improperly used funds in the Business Account that were to be divided with Shelley. In its August 2019 order on the motion for a new trial, the court agreed with Shelley and found that Jeffery wrote checks on the Business Account totaling $58,752.98 for legal fees to three different law firms. The court found that, although Jeffery testified that there was a separate civil lawsuit involving the parties in this case, $56,152.98 of legal fees had been paid to two law firms that had not represented B-Y in the separate civil lawsuit. Because the court was "not satisfied with [Jeffery's] vague explanation as to why he paid their attorneys' fees using the [Business Account]," $56,152.98 of attorney fees paid out of the Business Account were treated as a martial asset awarded to Jeffery on his side of the balance sheet.

Thereafter, in July 2020, Shelley filed an objection to the final accounting filed by Jeffery asserting that Jeffery had dissipated nearly all the funds held in the Business Account that were supposed to be split equally between the parties and that Jeffery failed to establish the expenses which were used to prepare B-Y's equipment for sale. In its January 2021 order relating to the

objection to the final accounting, the district court ordered Jeffery to reimburse Shelley for one-half of $17,633.08 in additional legal fees paid to another law firm out of the Business Account. The court stated:

> There is simply no way that payments made to [Dvorak] for representing B-Y in the civil suit against [Shelley], which B-Y dismissed on its own motion . . . could possibly constitute "operating expenses incurred to prepare the equipment for sale." [Jeffery] shall reimburse [Shelley] for half of the $17,633.08 (or $8,816.54) which he dissipated from the B-Y account to pay [Dvorak].

Under our de novo review of the record, there is no dispute that Dvorak law firm represented B-Y in a civil suit against Shelley for damages and in another civil suit against his stepdaughter related to property awarded to Shelley. The question then is whether the payment of attorney fees from the Business Account to the Dvorak law firm in its representation of B-Y in a suit against Shelley was a permitted expense.

Jeffery contends that, although B-Y's case against Shelley was dismissed, he should not have been required to reimburse Shelley for that half of the attorney fees because the fees represented an "actual cost" of the parties and not a personal expenditure. Shelley contends that Jeffery failed to show how attorney fees paid to Dvorak law firm amounted to an expense incurred to prepare the equipment for sale since that lawsuit was irrelevant to such sale.

As it related to how the Business Account was to be used in connection with the decree, the district court stated:

> The Court further finds that [the Business Account] . . . is the account [Jeffery] has been utilizing during the divorce proceeding, to fix up and prepare equipment for sale, to pay accounting expenses and to pay his salary. This account has continued to be used after the last date of trial. The Court finds that [Jeffery] should continue to utilize that account for such purposes and all proceeds from the auction sale of the equipment set forth above, should be deposited into this account and [Jeffery] should continue to provide monthly accountings to [Shelley].

As it related to the accounting to be provided, the court originally ordered:

> All proceeds from the sale of the equipment shall be deposited into [the Business Account]. [Jeffery] shall provide to [Shelley] a monthly accounting of the sale of these assets, and a monthly accounting of the monies held in [the Business Account], including a list of all operating expenses incurred to prepare the equipment for sale, to pay [Jeffery's] salary and accounting expenses, together with expenses incurred by Auction Time.

Thereafter, in its August 2019 amended order, the district court modified the aforementioned paragraph to provide:

> All proceeds from the sale of the equipment shall be deposited into [the Business Account]. [Jeffery] shall provide to [Shelley] a monthly accounting of the sale of these assets, and a monthly accounting of the monies held in [the Business Account], including a list of all operating expenses incurred to prepare the equipment for sale, to pay [Jeffery's] salary and accounting and <u>actual expenses,</u> together with expenses incurred by Auction Time.

Following the court's amended decree, which neither party appealed, Jeffery was permitted to use the account to prepare the equipment for sale, as a repository for liquidated assets, and to pay the associated sale and accounting expenses. The attorney fees paid by Jeffery to the Dvorak law firm were not associated with the business assets designated for sale or associated sale and accounting expenses. Accordingly, we find that the court did not abuse its discretion in finding that Jeffery's payment of these fees from the Business Account were an unauthorized expenditure and should be reimbursed. This assignment fails.

### (c) Lifetyme Boat

Jeffery next argues that the district court erred in failing to give him credit for his sale of the "Lifetyme boat" which proceeds were deposited into the Business Account even though it was an asset awarded to him under the decree and not a business asset of B-Y ordered to be sold and the proceeds deposited.

The trial held by the district court over 3 days in September and November 2020 was in response to Shelley's motion objecting to the accounting of the Business Account administered by Jeffery. As described before, this issue presented to the court was identified as an unauthorized expenditure by Jeffery from the Business Account. Both before and during the trial, Jeffery never requested a credit to be awarded to him for the sale and subsequent deposit of the proceeds from that sale for the Lifetyme boat. Jeffery only mentioned the boat at the hearing in relation to the sale of certain business assets to a particular company without affirmatively requesting a credit. Following the court's order governing the trial, Shelley filed a motion for a new trial or to alter or amend that order. The Lifetyme boat was once again discussed, but a credit was not requested by Jeffery.

On appeal, Jeffery now asserts that he should have been entitled to a credit for the Lifetyme boat since it was personally awarded to him and that he deposited the funds from its sale into the Business Account. However, as we have often said, a district court cannot commit error in resolving an issue never presented and submitted to it for disposition. *In re Interest of Rosso*, 270 Neb. 323, 701 N.W.2d 355 (2005). This assignment of error fails.

### 3. SHELLEY'S CROSS-APPEAL

Shelley's cross-appeal is directed only at issues decided in connection with her objections to Jeffery's accounting of the Business Account. She specifically assigns that the court erred in finding Jeffery did not make unauthorized salary withdrawals from the Business Account from November 2018 to August 2019; did not make unauthorized personal withdrawals for certain miscellaneous utility-type services; that the court erred in not identifying a starting value for the Business Account; and that the court erred in not requiring a division of the remaining proceeds in the Business Account. We will discuss each of these issues independently.

### (a) Salary Expense

Shelley first argues that Jeffery's salary withdrawals from the Business Account in the amount of $132,153.22 from November 2018 to August 2019 were unauthorized.

In the court's original decree entered on June 10, 2019, the court awarded the B-Y business shares to Jeffery but ordered that certain business assets shall be sold, and the proceeds deposited

in the Business account; that Jeffery could withdraw certain limited expenses associated with the sale of the assets including a salary; and that the net proceeds would be divided between Jeffery and Shelley. After entering that decree, Shelley filed a motion for new trial or to alter or amend the decree. That motion included a challenge to Jeffery for having taken a salary from the Business Account. Following a hearing on that motion, the court entered an order amending its original decree and finding, in part, that Jeffery was prohibited from drawing his salary from the Business Account because "B-Y is no longer in business. It is not reasonable for [Jeffery] to continue to draw a $175,000.00 annual salary to prepare the assets for sale. Doing so would constitute a dissipation of marital assets and would be inequitable."

As part of the court's rationale for originally allowing the salary, the court made reference to a statement during the dissolution trial where Shelley's counsel indicated counsel had no objection to Jeffery continuing to take a salary. Notwithstanding the remark, the court reversed its decision on allowing a continuing salary and removed the provision for that salary from the original decree. The court later cited Jeffery's lack of continuing salary as a justification for removing Jeffery's obligation to provide alimony to Shelley. Neither party disputes the fact that Jeffery did not provide himself with a salary after the court amended its decree in August 2019. Following a new trial on the limited issue of a disputed tax allocation, the court issued a final amended decree on October 14, 2019, wherein the court incorporated language removing Jeffery's right to pay himself a salary. But, unlike the unauthorized reduction for attorney fees discussed before, the court did not list salary paid during the pendency of the prior order as an asset on Jeffery's side of the ledger. Neither party appealed from the findings set forth therein.

Shelley now attempts to dispute salary payments made by Jeffery from the Business Account from November 2018 to August 2019 in connection with the accounting proceeding. There is no question that Jeffery was authorized to pay himself a salary at the time he paid it but was prohibited after August 2019 when the court first amended the decree. The question is, can Shelley now object to the salary payments under the auspices of the objection proceeding reserved by the court based upon an amended decree when the salary was authorized at the time it was taken. The district court found that the salary deduction could not be contested because, when the payments were made, the payments were not in contravention of the then current court order. We agree for two separate reasons.

First, although the August 2019 order prohibited Jeffery from taking any further salary from the Business Account, the June 10, 2019, decree specifically authorized it. As we stated earlier, Shelley's objection to Jeffery's accounting of the Business Account is a contempt proceeding designed as a remedy for noncompliance with a court's order. Because when Jeffery removed his salary prior to August 2019, he was not violating the court's order, we find that the court did not err in finding that the removal of the salary was not prohibited. Second, if Shelley believed she was entitled to an additional marital asset based upon Jeffery's conduct in connection with his salary which was analyzed by the court at the time the court entered its final amended decree on October 10, 2019, she could have appealed from that decree. She did not. That amended decree contemplated a future right for Shelley to contest an accounting of the Business Account for activities not resolved by the amended decree but not as a mechanism to resolve matters that were already decided and not appealed. This assigned error fails.

### (b) Payments to Lutz Accounting Firm

Shelley next argues that the district court erred in failing to find that certain payments to the Lutz accounting firm from the Business Account were unauthorized under the decree. Shelley argues that the court's decree limited Jeffery to paying expenses associated with preparing the equipment for sale. She argues that because payments to Lutz do not fit within that framework, those payments, in the amount of $7,772.89, were unauthorized. The district court found there was insufficient evidence presented to establish whether these payments were, in fact, contemplated by the order. As we stated before, the decree allowed Jeffery to pay "[Jeffery's] accounting and actual expenses, together with expenses incurred by Auction Time." As such, payments by Jeffery to the Lutz accounting firm appear to at least meet the description of an accounting expense. The district court found that there simply was not sufficient evidence provided to consider these accounting payments unauthorized. In a civil contempt preceding, the burden to prove all elements of civil contempt are on the complainant who must prove those elements by clear and convincing evidence. *Becher v. Becher*, 311 Neb. 1, 970 N.W.2d 472 (2022). After reviewing the conflicting testimony governing the source of these payments to the accounting firm, we cannot say that the court abused its discretion in finding that Shelley failed to prove these payments were unauthorized under the decree. This assigned error fails.

### (c) Jeffery's Personal Monthly Expenses

Shelley asserts that the district court erred in finding that the evidence was insufficient for the court to conclude payments for certain garbage, rent, telephone, and utility expenses in the total amount of $12,653.15 were unauthorized payments from the Business Account under the decree. The district court found "it was without sufficient information as to whether payments for garbage service, rent, telephone, and utilities were necessary operating expenses incurred with official B-Y business in wrapping up the business and preparing equipment for sale." We disagree in part.

We agree it is at least arguable that the garbage, telephone, and utility fees could be expenses associated with the sale of the business assets and we cannot say that the court abused its discretion in so finding. However, the records indicate that $6,300 in rental payments were made to Jeffery's brother. In the amended decree, Jeffery was awarded the shop and business office for B-Y and had no reason to incur rental costs associated with selling the business assets and he provided no legitimate reason why these rental payments to his brother constituted authorized expenditures under the decree. Having provided no legitimate explanation as to how this expense is associated with the sale of business equipment, we find that the court erred in finding that it was an authorized payment from the Business Account. We will discuss the impact of this finding in the court's order in the remaining sections of this opinion.

### (d) Beginning Value of Business Account

Shelley next argues that the court erred in not adopting the Business Account value of $194,697.60 for purposes of its dissipation analysis. She argues this resulted in a significant marital asset being unvalued in contravention of Nebraska law.

As we stated before, the court entered its amended decree on October 4, 2019. In its balance sheet, it did not include the Business Account. Instead, the decree referred only to the Business

Account as the conduit for the future sale of certain business assets, the net value of which would be split among the parties. There was no appeal taken from that decree. To the extent Shelley is arguing the court erred in failing to assign value to the account in connection with the amended decree, that issue should have been raised in an appeal from that amended decree.

That said, the decree did contemplate a future sale of certain business assets, a deposit of funds in the Business Account, authorization for certain limited expenses, and then a division of the net proceeds. The court required Jeffery to account monthly for the Business Account following the issuance of the initial and amended decrees, required a final accounting be submitted, and provided a procedure by which Shelley could contest that accounting. Jeffery ultimately did provide an accounting relating to the Business Account retroactive to November 1, 2018. And as demonstrated by Exhibit 300, Shelley was able to contest any and all transactions made from the account during that relevant period. The court made findings governing all contested transactions spanning between November 2018 and the date of the trial on November 9, 2020, (at which time $7,772.89 remained in the account) and the court entered a final payment obligation after performing that analysis. The court's amended decree required Jeffery to maintain the Business Account in a specified manner and then split the remaining proceeds with Shelley upon the conclusion of his official duties. It separately provided Shelley with a remedy to contest Jeffery's administration of those duties. Inherent in the court's decree is a specified period of time that the proceeds in the account would be maintained and then evenly split. In order to determine the split, it was essential to have a beginning date and ending date where the proceeds could be monitored and so that the split of the proceeds could be determined. Even though the court did not expressly set the starting date of the account or its value, it is clear from the record that the court analyzed all disputed transactions commencing as of November 1, 2018, through the date of the trial. Equally clear is that Shelley had an opportunity to and did contest entries made during that relevant period.

Although the court did not expressly state it, we find that the proceeding did fairly allow Shelley to contest the expenses from the Business Account during relevant periods as contemplated by the court's amended decree. As such, we find as to Shelley's particular assigned error, that the court failed to adopt a beginning value of the Business account, fails because it is refuted by the record based on the court's analysis. We will further discuss the impact of that adoption in connection with Shelley's final assignment.

(e) Remaining Balance in B-Y Account

Shelley finally argues the court erred in failing to order Jeffery to pay Shelley one-half of the proceeds remaining in the Business Account following its findings governing all other transactions disputed by Shelley.

It is true that the court's order required Jeffery to split one-half of the net proceeds in the Business Account following the sale of the business assets. As stated above, the court did review all challenged transactions from November 2018 to November 2020 except those already raised in connection with the entry of the amended decree, and the court ordered Jeffery to pay one-half of all unauthorized expenditures. Shelley argued that in addition to paying her one-half of the unauthorized expenditures, Jeffery should be ordered to pay Shelley one-half of the $7,772.89 remaining in the account as of November 2020.

In the court's amended decree, it ordered Jeffery to pay Shelley a combined equalization payment in the amount of $308,793.24. It also required Jeffery to later liquidate assets, place the proceeds into the Business Account, and split the net proceeds with Shelley. As such, the total amount paid to Shelley under the amended decree was to be a combination of those obligations. During the course of the proceedings, Jeffery paid sums to Shelley to partially satisfy these obligations. The total value owed from the combined obligations will only be determined when this matter becomes final. As it relates to this specific assignment, Shelley argues that part of the obligation should include one-half of the remaining sum in the Business Account. In order to determine if that is correct, that required a computation of what has already been paid to Shelley from the combined obligations stated above. The court concluded that from the evidence presented, the evidence was insufficient to conclude whether Shelley has been paid in full relating to the obligations set forth in the decree.

The purpose of the objection to the accounting proceeding was to reserve Shelley's right to contest Jeffery's management of the Business Account as ordered by the court in its amended decree. That involved determining its starting value, analyzing contested payments, and determining its proper final value so that the value could be properly split between Jeffery and Shelley. When coupled with the equalization payment, the combined amounts represent Jeffery's obligations under the decree. In order to determine the final Business Account value to be split, we must first determine the amount which would have been in the Business Account but for Jeffery's unauthorized payments to himself and others. One-half of that value, when combined with the equalization payment, would be Jeffery's total obligation under the decree. Once that number is determined only then could the parties determine whether Jeffery has made all payments required or whether monies are still due and owing. The issue is complicated by the fact that Jeffery made an $85,000 payment from the Business Account which was designated as a payment to satisfy a portion of his equalization payment obligation. However, the issue before this court is not whether Shelley has been paid in full for both obligations. It is only what is due to be paid under the Business Account. We agree with the district court that the evidence was insufficient to simply say Jeffery must pay Shelley one-half of the remaining balance in the Business Account because of the lack of evidence of what was still owed. That said, it is clearly part of the computation that must be made in deciding how much from the Business Account was required to be paid to Shelley. That issue was relevant to this proceeding and is captured by this assignment of error. For the sake of clarity, then, we provide the final computation of that account as directed by the district court's order and our holdings herein.

Rather than the approach taken by the district court, we approach the determination of what Jeffery owed Shelley under the Business Account as follows:

| January 2021 Order | |
|---|---|
| **1. Dvorak Law** | $17,633.18 |
| **2. Payment to Shelley for Equalization** | $85,000.00 |
| **3. Personal Health Insurance Premium** | $11,144.40 |
| **4. Witness Fees** | $1,100.00 |
| **Total Dissipated** | $114,877.58 |
| **5. Reimbursement for Boat Motors** | ($8,000.00) |
| **Total After Credit** | $106,877.58 |
| **Shelley's 1/2** | $53,548.79 |
| **6. Reimbursement for Shed and Fees** | ($9,750.00) |
| **Shelley's 1/2 Entitlement from Business Account less her payment obligation for the shed and fees** | **$43,688.79** |
| | |
| | |
| **May 2021 Order** | |
| **1. Pickup Truck** | $12,000.00 |
| **2. Additional Attorney Fees** | $30,431.52 |
| **3. Credit Card** | $26,678.67 |
| **4. Insurance Payment** | $12,302.92 |
| **5. Treasurer** | $ 5,403.64 |
| **6. Rent** | $ 6,300.00 |
| **Total Dissipated** | $93,116.75 |
| **Shelley's ½ Entitlement From Business Account** | **$46,558.36** |
| | |
| **Shelley's Total Entitlement (Both Orders)** | $90,247.15 |
| | |
| **Total Remaining in Account** | $ 7,772.89 |
| **Shelley's 1/2 Entitlement** | $ 3,886.46 |
| | |
| **Total Owed to Shelley** | **$94,133.61** |

Based on our review of the court's calculations, we find that the court's January 2021 order contained a mathematical error in its calculation. The court ordered Jeffery to pay to Shelley $39,668.74. However, using the numbers provided by the court for determining that value, we find that the correct sum is $39,688.74. Our calculation reflects that correction. In addition, we find

that the court erred in its crediting of the boat motors. To ensure that Jeffery receives the full value of that asset, it should be subtracted from the total amount dissipated from that January order prior to being divided between the parties.

Following our analysis, we conclude that Jeffery was required to pay Shelley $94,133.61 for her one-half share of the Business Account after applying the proper reduction for her required reimbursement of the shed and fees. When combined with the $308,793.24 equalization previously ordered by the district court, Jeffery's full payment obligation under the amended decree is $402,926.85. We make no findings as to what has been paid to Shelley in relation to those obligations as that issue is not presently before us.

## VI. CONCLUSION

In sum, we find that the court did not abuse its discretion in failing to hold Shelley in contempt of court on certain matters, finding that Jeffery had dissipated assets, or in failing to give Jeffery a credit for his boat. Further, we find that the district court did not err in its determination that Jeffery did not improperly expend funds from the Business Account to pay his salary or for his payments to Lutz accounting firm. Additionally, we find that the record refutes Shelley's claim that the court did not adopt a beginning value on the Business Account. We affirm as modified the order as it relates to Jeffery's personal expenditures from the Business Account for rental payments to his brother. Finally, we affirm as modified the court's calculation of improper expenditures from the Business Account for which Jeffery is obligated to pay Shelley.

AFFIRMED AS MODIFIED.